[Cite as *NWO Holdco, L.L.C. v. Hilliard Energy, Ltd.*, 2022-Ohio-881.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# PAULDING COUNTY

NWO HOLDCO, L.L.C.,

    PLAINTIFF-APPELLEE,

                                CASE NO. 11-21-03

    v.

HILLIARD ENERGY, LTD.,

    DEFENDANT-APPELLANT,

    -and-                                 O P I N I O N

TRISHE RESOURCES, INC., ET AL.,

    DEFENDANTS-APPELLEES.

---

**Appeal from Paulding County Common Pleas Court**
**Trial Court No. CI 17 144**

**Judgment Affirmed**

**Date of Decision: March 21, 2022**

---

APPEARANCES:

    *Kimberly A. Conklin* **for Appellant**

    *Andrew R. Mayle and Joseph Czerniawski* **for Appellee, Punjab National Bank (International) Ltd.**

**MILLER, J.**

{¶1} Appellant, Hilliard Energy, Ltd. ("Hilliard"), appeals the April 7, 2021 judgment of the Paulding County Court of Common Pleas denying its motion for summary judgment and granting the motion for summary judgment of appellee, Punjab National Bank (International) Ltd. ("Punjab"). For the reasons that follow, we affirm.

## I. Facts & Procedural History

{¶2} This matter arises out of the development and eventual sale of a wind farm project (the "Project") in Paulding and Van Wert Counties. The Project was originally owned and developed by Trishe Wind Energy, Inc. ("TWE"). Punjab financed the Project as TWE's lender.

{¶3} By July 2014, TWE was indebted to Punjab in the amount of $11,029,361.50. Around that time, TWE and Punjab "determined that the best way for [Punjab] to recover its outstanding indebtedness was for [Trishe Resources, Inc. ("TRI")] to purchase the Project and assume the indebtedness to Punjab and sell off the Project at a market rate to achieve the best possible recovery for Punjab." (May 4, 2020 Aff. of Pramod Kumar at ¶ 6). To that end, Punjab and TRI executed a Facility Agreement on July 21, 2014, whereby Punjab agreed to provide TRI with a short-term loan facility of $3,000,000 and TRI agreed to assume TWE's debt to Punjab.

{¶4} After acquiring TWE's interests in the Project, TRI began the process of finding a buyer. TRI enlisted Hilliard, a consulting firm, to assist in that effort. In August 2014, Hilliard entered into a Consulting Services Agreement ("CSA") with TRI and three of TRI's wholly-owned subsidiaries, including Trishe Wind Ohio, LLC ("TWO")—the entity responsible for operating the Project. Under the CSA, Hilliard agreed to help TRI locate a buyer and consummate a sale of the Project. TRI agreed that, should the Project be sold during the term of the CSA, it would pay Hilliard a "Success Fee," defined as 12 percent of the "value, whether cash or other valuable assets, paid or otherwise awarded to [TRI] as compensation for the sale of the [Project] to a buyer or investor."

{¶5} Shortly thereafter, TRI agreed to sell the Project to Starwood Energy Group Global ("Starwood"). To facilitate its purchase and completion of the Project, Starwood created a special-purpose entity, NWO Holdco, L.L.C. ("NWO").

{¶6} In October 2014, TRI, TWO, NWO, Punjab, and Hilliard executed (in various combinations) a series of documents respecting the sale of the Project. Three agreements formed the core of these documents: the Assignment and Assumption of Land Lease and Wind Easements ("AALLWE"), the Membership Interests Assignment Agreement ("MIAA"), and the Membership Interest Purchase and Sale Agreement ("MIPSA"). Under the AALLWE, all of TRI's rights in "certain lease, easement, participation and purchase option agreements" underlying

the Project were assigned to TWO. Via the MIAA, TRI irrevocably assigned 100 percent of its membership interests in TWO to NWO. Finally, pursuant to the MIPSA, NWO agreed that, "[i]n consideration for the sale, assignment, conveyance, transfer and delivery" of all of TRI's membership interests in TWO, NWO would "provide the following consideration to [TRI]." This provision was followed by a series of formulas establishing the amount NWO would be required to pay under the MIPSA ("Purchase Price") and a list of milestones that would trigger NWO's obligation to make installment payments of the Purchase Price. The MIPSA further provided that NWO "shall make all payments of the Purchase Price to the account designated in the Payment Instruction Letter and any instruction regarding the payment of the Purchase Price shall be subject to the terms thereof."

{¶7} The Payment Instruction Letter ("PIL") in turn provided:

[TRI] hereby irrevocably authorizes and directs that any payments which are due and payable to [TRI] under the [MIPSA], including without limitation all payments of the Purchase Price, shall be made directly to [sic] in accordance with the following payment instructions:

CITIBANK, NEW YORK
SWIFT CODE: * * *
A/c Name: PUNJAB NATIONAL BANK (INTERNATIONAL) LTD
A/c NUMBER: * * *
SWIFT CODE: * * *
Routing number: * * *
Beneficiary A/c no: * * *
IBAN No: * * *
Beneficiary A/c Name: Trishe Resources Inc.

> [TRI] hereby agrees that [NWO] may rely on the instructions set forth above and each of [TRI] and [Punjab] hereby expressly releases [NWO] from all liability for making payments in accordance with such instructions.  [TRI] agrees that it shall not submit any change to the above payment instructions, and [NWO] shall not accept any change to the above payment instructions, absent the prior written consent of [Punjab].

Whereas the MIPSA was executed by TRI, TWO, and NWO, the PIL was signed by TRI, NWO, and Punjab.  Both the MIPSA and the PIL gave NWO the right to institute an interpleader action if any controversy arose between TRI and any other person "with regard to rights to or with respect to any payment of the Purchase Price."

{¶8} In another agreement, TRI, Punjab, and Hilliard reached an understanding regarding the funds deposited in the bank account specified in the PIL.  This agreement, fittingly labelled the "Tri-Party Agreement," extensively cross-referenced the other agreements entered into between the parties.  For example, the Tri-Party Agreement contained an acknowledgement that "[Punjab] will receive payments in to the TRI Account held with [Punjab] pursuant to the [MIPSA] and as directed pursuant to the [PIL]."  It also stated that "pursuant to [the CSA], * * * Hilliard is entitled to receive twelve percent (12%) of all Purchase Price payments made by [NWO]."  In furtherance of these other arrangements, the Tri-Party Agreement provided:

> For value received, [Punjab] hereby irrevocably, absolutely and unconditionally (subject to the terms and conditions hereof), agrees to pay to Hilliard by same day wire transfer, without set off or counterclaim and without deduction or withholding for or on account of taxes, an amount in US Dollars equal to twelve percent (12%) of all Purchase Price payments paid by [NWO] into the TRI Account or that are otherwise received by [Punjab] * * *. [Punjab] shall pay such amounts to Hilliard within one (1) Business Day following the date such amounts are deposited in the TRI Account, provided that, for the avoidance of doubt, it is hereby agreed that twelve percent (12%) of the first payment of Two Hundred and Fifty Thousand Dollars ($250,000), payable on the Closing Date, as defined in the [MIPSA], shall not be payable to Hilliard by [Punjab] hereunder and shall belong absolutely to [Punjab].

The "TRI-Account" was identified as the same bank account listed in the PIL. In addition, Punjab agreed that "its obligations under [the Tri-Party Agreement] are primary and shall continue even if all indebtedness and other amounts owing to [Punjab] in respect of TRI and/or TWO have been fully paid or otherwise satisfied * * *."

{¶9} After these agreements were concluded, TRI and Hilliard continued to work together to find buyers for other wind energy projects that TRI was developing. However, the relationship between TRI and Hilliard soured. In January 2015, Hilliard sued TRI, as well as two of TRI's wholly-owned subsidiaries,[1] for breach of contract in the 385th District Court in Midland County, Texas. In connection with the Texas lawsuit, Hilliard filed a notice of lis pendens with the

---

[1] Hilliard did not file suit against TWO, which had been released from its obligations under the CSA in connection with the sale to NWO.

Paulding County Recorder on February 23, 2015. The lis pendens purported to apply to the real estate interests formerly controlled by TRI but transferred to TWO (and NWO) as part of the sale of the Project.

{¶10} On May 19, 2017, the 385th District Court granted Hilliard a default judgment against TRI and its subsidiaries for "flagrant bad faith discovery abuses" and awarded Hilliard $2,498,119.37. On August 15, 2017, Hilliard filed an application to register the Texas judgment in the Paulding County Court of Common Pleas. Hilliard also filed a copy of the Texas judgment with the Paulding County Recorder.

{¶11} Around this time, Hilliard—apparently intending to tap into the Purchase Price payments owed by NWO under the MIPSA to obtain satisfaction of the Texas judgment—notified Starwood of its outstanding $2,498,119.37 claim against TRI. On September 12, 2017, Hilliard, Starwood, NWO, and TWO entered into an agreement whereby NWO agreed to invoke its right under the MIPSA to initiate an interpleader action. In exchange, Hilliard agreed to release its previously filed lis pendens, which it did on September 21, 2017.

{¶12} On October 19, 2017, NWO filed a complaint for interpleader pursuant to Civ.R. 22, naming TRI and Hilliard as defendants. NWO requested that it be permitted to deposit "up to $2,498,119.37, together with applicable post-judgment interest thereon," with the court for distribution by the court after a

determination of the "true and rightful recipient" of the funds. NWO further asked that the court issue an order discharging it "from any liability related to the [funds] * * * [and] from participation in this action * * *." On November 14, 2017, NWO filed a motion specifically requesting an order directing it to interplead the funds with the Paulding County Clerk of Courts. The trial court granted NWO's request on November 30, 2017, ordering NWO to deposit $2,498,119.37 with the court within 30 days. NWO subsequently deposited that amount with the court.

{¶13} On November 17, 2017, Hilliard filed its answer to NWO's complaint. Hilliard also filed a counterclaim against NWO, which was timely answered by NWO, as well as a cross-claim against TRI. On December 19, 2017, TRI answered NWO's complaint and Hilliard's cross-claim. TRI also filed a counterclaim against NWO and a cross-claim against Hilliard, both of which were timely answered.

{¶14} On February 22, 2018, Punjab filed a motion to intervene, which was granted by the trial court on March 21, 2018. Punjab then filed its answer to NWO's complaint, as well as cross-claims against TRI and Hilliard. TRI and Hilliard both timely answered Punjab's cross-claims.

{¶15} On June 2, 2020, Punjab filed a motion for summary judgment. In its motion for summary judgment, Punjab argued that neither Hilliard nor TRI were entitled to receive the funds on deposit with the court because those funds

constituted Purchase Price payments, which Punjab had sole right to possess under the various agreements concluded in October 2014.

{¶16} On June 25, 2020, NWO filed a memorandum in response to Punjab's motion for summary judgment, in which it represented that it did not oppose Punjab's motion. In addition, NWO filed its own motion for summary judgment requesting that it be granted the relief prayed for in its complaint, namely that it be dismissed from the interpleader action and discharged from liability with respect to the deposited funds. Finally, NWO moved for summary judgment on TRI's counterclaim, in which TRI claimed that NWO had breached the MIPSA by instituting the interpleader action, and on Hilliard's counterclaim, in which Hilliard claimed little more than that it was entitled to the funds deposited by NWO.

{¶17} On July 22, 2020, TRI filed a memorandum in opposition to NWO's motion for summary judgment on TRI's counterclaim. In its memorandum, TRI indicated that it too did not oppose Punjab's motion for summary judgment. NWO then filed a reply in support of its motion for summary judgment against TRI.

{¶18} On August 28, 2020, Hilliard filed a memorandum in opposition to Punjab's motion for summary judgment. Hilliard also filed its own motion for summary judgment, maintaining that it was the sole party entitled to the deposited funds by virtue of the "valid and subsisting" Texas default judgment as well as "the contracts between the parties to this case." Hilliard asserted that it had perfected a

lien on the deposited funds when it domesticated the Texas judgment in August 2017.

{¶19} On September 14, 2020, NWO filed a memorandum in response to Hilliard's motion for summary judgment. As with Punjab's motion for summary judgment, NWO indicated that it did not oppose Hilliard's motion.

{¶20} On October 1, 2020, Punjab filed a combined reply in support of its motion for summary judgment and memorandum in opposition to Hilliard's motion for summary judgment. Hilliard then filed a reply in support of its motion for summary judgment on October 26, 2020.

{¶21} On April 7, 2021, the trial court issued a judgment entry disposing of all motions then pending before the court. In its judgment entry, the trial court found as follows: (1) that "all of the relevant agreements are clear and unambiguous" and "Punjab is the only party with a legal right" to the deposited funds; (2) that "NWO properly instituted the interpleader action" as it was "specifically authorized to do so by the MIPSA"; and (3) that Hilliard was too "vague in what relief it [was] seeking from NWO apart from disposition of the funds deposited with the court" and never "provided additional clarification." Based on these findings, the trial court granted Punjab's and NWO's motions for summary judgment, but denied Hilliard's motion for summary judgment. Accordingly, the trial court dismissed NWO from the interpleader action, discharged it from liability with respect to the

deposited funds, and entered judgment in favor of NWO as to TRI's and Hilliard's counterclaims.[2] The trial court also ordered that Punjab was entitled to receive the deposited funds.

## II. Assignments of Error

{¶22} On April 30, 2021, Hilliard timely filed a notice of appeal.[3] It raises the following two assignments of error for our review:

> **1. The trial court erred in granting summary judgment for intervening defendant Punjab National Bank (International) Ltd.**
>
> **2. The trial court erred in denying summary judgment for Hilliard Energy, Ltd.**

Because Hilliard's assignments of error concern interrelated issues, we address them together.

## III. Discussion

{¶23} In its assignments of error, Hilliard argues that the trial court erred by denying its motion for summary judgment while simultaneously granting Punjab's motion for summary judgment. Hilliard maintains that the trial court's decision was

---

[2] The parties to this appeal do not challenge these orders or the trial court's resolution of NWO's motion for summary judgment.

[3] The trial court's April 7, 2021 judgment entry did not expressly dispose of TRI's cross-claim against Hilliard or Hilliard's cross-claim against TRI. However, Hilliard's cross-claim against TRI was identical to its counterclaim against NWO and thus was effectively resolved when the trial court granted Punjab's and NWO's motions for summary judgment. Likewise, TRI's cross-claim against Hilliard, in which TRI asked for a "declaratory ruling" that Hilliard had no right to the deposited funds, was effectively resolved through the trial court's ruling on Punjab's motion for summary judgment. In any event, even if TRI's and Hilliard's cross-claims had not been mooted, the trial court's judgment entry contains Civ.R. 54(B) language, which allows this court to review the trial court's April 7, 2021 judgment as a final, appealable order. *See Santomieri v. Mangen*, 3d Dist. Auglaize No. 2-17-05, 2018-Ohio-1443, ¶ 7-9.

erroneous because under the various agreements concluded in October 2014, the interpleaded funds, which represent Purchase Price payments, are the property of TRI rather than Punjab. Hilliard contends that because the funds are TRI's property, Hilliard has the superior claim to the funds as TRI's judgment creditor with a valid judgment lien on the funds.

## A.    Summary-Judgment Standard of Review

{¶24} We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000). "De novo review is independent and without deference to the trial court's determination." *ISHA, Inc. v. Risser*, 3d Dist. Allen No. 1-12-47, 2013-Ohio-2149, ¶ 25.

{¶25} Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994). Material facts are those facts "'that might affect the outcome of the suit under the governing law.'" *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Whether a genuine issue exists is answered by the following inquiry: [d]oes the evidence present 'a sufficient disagreement to require submission to a

jury' or is it 'so one-sided that one party must prevail as a matter of law[?]'" *Id.*, quoting *Anderson* at 251-252.

{¶26} "The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact." *Carnes v. Siferd*, 3d Dist. Allen No. 1-10-88, 2011-Ohio-4467, ¶ 13, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). "In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument." *Id.*, citing *Dresher* at 292. "The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings." *Id.*, citing *Dresher* at 292 and Civ.R. 56(E).

**B. Civ.R. 22 & Interpleader Procedure**

{¶27} In Ohio, interpleader is governed by Civ.R. 22, which provides as follows:

> Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. It is not ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical but are adverse to and independent of one another, or that the plaintiff avers that he is not liable in whole or in part to any or all of the claimants. A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim. The provisions of this rule supplement and do not in any way limit the joinder of parties permitted in Rule 20.

> In such an action in which any part of the relief sought is a judgment for a sum of money or the disposition of a sum of money or the disposition of any other thing capable of delivery, a party may deposit all or any part of such sum or thing with the court upon notice to every other party and leave of court. The court may make an order for the safekeeping, payment or disposition of such sum or thing.

"[T]he purpose of Civ.R. 22 regarding interpleader is 'to expedite the settlement of claims to the same subject matter, prevent multiplicity of suits, with the attendant delay and added expense, and to provide for the prompt administration of justice.'" *John Hancock Mut. Life Ins. Co. v. Bird*, 69 Ohio App.3d 206, 208 (3d Dist.1990), quoting *Sharp v. Shelby Mut. Ins. Co.*, 15 Ohio St.2d 134, 144 (1968).

{¶28} Interpleader is "a two-stage action" involving a stakeholder who "controls a fund [that] is subjected to the claims of two or more claimants" and "does not know who is the proper claimant." 1970 Staff Note, Civ.R. 22. "In the first stage, the stakeholder, in order to avoid a multiplicity of suits and possible multiple liability, interpleads the claimants." *Id.* If the trial court determines that interpleader is appropriate and that the claimants should be made to litigate their respective claims to the contested fund, the stakeholder is usually dismissed upon deposit of the fund with the court. *See id.* (noting that, by the end of the first stage, the stakeholder "ordinarily * * * drops out, leaving the claimants to establish the validity of one of the claims"); *see also Aetna Life Ins. Co. v. Schilling*, 67 Ohio St.3d 164, 165 (1993) (life insurer filed an action for interpleader and "was

dismissed from the lawsuit upon depositing the insurance proceeds into an interest-bearing account").

{¶29} The action then moves to stage two, where the court must "decide the claimants' relative rights and priority to the interpled funds." *Insura Property & Cas. Co. v. Bird Feeders of Am., Inc.*, 10th Dist. Franklin No. 98AP-1506, 1999 WL 771066, *2 (Sept. 30, 1999), citing *Kabbaz v. Prudential Ins. Co. of Am.*, 27 Ohio App.3d 254 (3d Dist.1985). Stage two proceeds "via normal litigation processes, including pleading, discovery, motions, and trial." *United States v. High Technology Prods., Inc.*, 497 F.3d 637, 641 (6th Cir.2007) (discussing analogous Fed.R.Civ.P. 22). "As in other cases, when there is no genuine issue of material fact, the second stage may be adjudicated on summary judgment motions." *C&C North Am. Inc. v. Natural Stone Distribs., LLC*, 571 S.W.3d 254, 265 (Tenn.App.2018) (dealing with Tennessee Civil Rule 22.01, which is comparable to Civ.R. 22).

{¶30} In stage two, each claimant must "establish the validity of his claim by a preponderance of the evidence." *Am. Gen. Life & Acc. Ins. Co. v. Harris*, 3d Dist. Allen No. 1-90-35, 1991 WL 54827, *2 (Apr. 4, 1991). "To entitle a claimant to a decree, he must have a title or lien, legal or equitable, with respect to the fund deposited." 48 Corpus Juris Secundum, Interpleader, Section 45. The claimant "must recover on the strength of his own title rather than on the weakness of that of

the adversary." 48 Corpus Juris Secundum, Interpleader, Section 41. "Before an issue of priority among claimants is properly presented, it must be determined whether each of the claimants has a cognizable interest in the fund." 44B American Jurisprudence 2d, Interpleader, Section 62.

**C. The trial court did not err in its resolution of the motions for summary judgment because Punjab demonstrated its entitlement to the interpleaded funds, whereas Hilliard did not.**

{¶31} In the case sub judice, there is no dispute that the specific funds interpleaded by NWO represent Purchase Price payments. As the identity of the funds is not at issue, this case turns on whether contract-interpretation principles or priority-of-liens principles, or some combination of the two, should be applied to determine which of Punjab or Hilliard is entitled to the funds. After reviewing all of the evidence submitted in support of the parties' motions for summary judgment and examining the underlying transaction, it is clear that the issues in this case are primarily issues of contract interpretation.

**i. Punjab demonstrated that there is no genuine issue of material fact that, under the agreements executed in October 2014, it has a right to the interpleaded funds.**

{¶32} In support of its motion for summary judgment, Punjab submitted copies of the various contracts executed in October 2014 that pertain to the sale of the Project. Of these contracts, the MIPSA and the PIL are the most significant because together they create the right to receive Purchase Price payments and direct

how, and to whom, Purchase Price payments are to be made. The MIPSA and the PIL each provide that they are governed by, and are to be construed in accordance with, the laws of the State of New York. Accordingly, New York law guides our interpretation of these agreements.

{¶33} In New York, as in Ohio, "[w]hen engaging in contract interpretation, 'the standard of review is for this Court to examine the contract's language de novo.'" *MPEG LA, LLC v. Samsung Electronics Co., Ltd.*, 166 A.D.3d 13, 17 (2018), quoting *Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137, 140 (2008). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). "'The best evidence of what parties to a written agreement intend is what they say in their writing.'" *Id.*, quoting *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.*

{¶34} Furthermore, "[i]t is well settled that a contract must be read as a whole to give effect and meaning to every term." *New York State Thruway Auth. v. KTA-Tator Eng. Servs., P.C.*, 78 A.D.3d 1566, 1567 (2010). "Indeed, '[a] contract should be interpreted in a way [that] reconciles all [of] its provisions, if possible.'" *Id.*, quoting *Green Harbour Homeowners' Assn., Inc. v. G.H. Dev. & Constr., Inc.*, 14

A.D.3d 963, 965 (2005). "'[T]he court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized.'" *NRT New York, LLC v. Harding*, 131 A.D.3d 952, 954 (2015), quoting *G3-Purves St., LLC v. Thomson Purves, LLC*, 101 A.D.3d 37, 40 (2012).

{¶35} "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide." *Greenfield* at 569; *see NRT New York* at 954 ("Extrinsic and parol evidence of the parties' intent may not be admitted to create ambiguity in a contract that is unambiguous on its face * * *."). "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Greenfield* at 569, quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978). "Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Id.* at 569-570.

{¶36} The ultimate question here is whether there is a genuine issue of material fact that the parties to the MIPSA (i.e., NWO, TRI, and TWO) and the PIL (i.e., NWO, TRI, and Punjab) intended for Punjab, rather than TRI, to possess the right to receive Purchase Price payments from NWO. We conclude no triable issue

of material fact exists and Punjab possesses the right to receive payments from NWO.

{¶37} As Hilliard notes, the MIPSA states that NWO "shall provide * * * consideration *to the Seller*," which, by itself, would suggest that the right to receive Purchase Price payments belongs to TRI. Unfortunately for Hilliard, this provision does not stand alone. Instead, the MIPSA expressly provides that payments of the Purchase Price are subject to the terms of the PIL, which contains language supporting that Punjab owns the right to receive Purchase Price payments. While the PIL acknowledges that Purchase Price payments "are due and payable *to Seller* under the [MIPSA]," the PIL contains language indicating that the right to receive Purchase Price payments belongs to Punjab. First, the PIL states that TRI has "irrevocably authorize[d] and direct[ed]" that Purchase Price payments owing under the MIPSA be deposited in a bank account bearing the name "PUNJAB NATIONAL BANK (INTERNATIONAL) LTD." Furthermore, in the PIL, TRI and NWO both agreed that Punjab's prior written consent would be required before Purchase Price payments could be directed to a bank account other than the one listed in the PIL. Taken together, these provisions are suggestive of an intent to divest TRI of the right to receive Purchase Price payments and invest Punjab with that same right.

{¶38} Insofar as there is any doubt regarding Punjab's rights under the PIL, it is appropriate to look to the other agreements executed in October 2014, specifically the Tri-Party Agreement, for clarification. The Tri-Party Agreement, which was executed on the same day as the MIPSA and PIL and which explicitly contemplates both the MIPSA and the PIL, was clearly executed in connection with the sale of the Project and in furtherance of that transaction. "Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even [if] they were executed on different dates and were not all between the same parties.'"[4] *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir.2005), quoting *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir.1998). Therefore, the Tri-Party Agreement illuminates the meaning of the language used in the PIL and helps to explain the scope of the rights created under the PIL.

{¶39} Upon reading the PIL in conjunction with the Tri-Party Agreement, two things come into focus. First, the Tri-Party Agreement states that "[Punjab] will receive payments in to the TRI Account held with [Punjab]," and it repeatedly refers to the "Purchase Price payments received by [Punjab]." Thus, the Tri-Party Agreement makes clear that, under the PIL, Punjab is to be the direct recipient of Purchase Price payments.

---

[4] We note that, like the MIPSA and PIL, the Tri-Party Agreement provides that it is governed by, and is to be construed in accordance with, the laws of the State of New York.

{¶40} Second, the Tri-Party Agreement provides insight into Punjab's and TRI's respective rights in the bank account listed in the PIL, which is called the "TRI Account" in the Tri-Party Agreement. The Tri-Party Agreement leaves no room for a conclusion that TRI owns or has any rights in the TRI Account. To begin, the Tri-Party Agreement spells out that the first $250,000 deposited in the TRI Account "belong[s] absolutely" to Punjab. Furthermore, the Tri-Party Agreement provides that, other than the first $250,000 deposited in the TRI Account, Punjab is obligated to pay Hilliard 12 percent of all Purchase Price payments it receives from NWO. This latter provision, by which Punjab effectively took on TRI's obligations under the CSA to pay Hilliard its 12 percent Success Fee, is especially important because it indicates that Punjab, rather than TRI, owns and has control over the Purchase Price payments made by NWO and deposited into the TRI Account. That is, if TRI has the right to receive Purchase Price payments from NWO, an ownership interest in the TRI Account, and the right to control disposition of the Purchase Price payments deposited in the TRI Account, then Punjab's agreement to pay Hilliard is unnecessary; TRI could simply pay Hilliard directly. In our view, reading the PIL together with the Tri-Party Agreement resolves any doubts concerning Punjab's right to directly receive Purchase Price payments and Punjab's and TRI's respective rights in the TRI Account.

**{¶41}** To further support our conclusion that the agreements leave no doubt regarding Punjab's possessory interest in the Purchase Price payments, we also review the affidavits Punjab submitted in support of its motion for summary judgment. Two of these affidavits—the September 28, 2020 affidavit of Pramod Kumar and the September 29, 2020 affidavit of Randall Washington—are particularly notable, and we acknowledge them only as confirmation of our interpretation of the various contracts. In his affidavit, Washington, the Chief Financial Officer and a Director of TRI, averred that "to effectuate the Purchase Price Payments from [NWO] for the sale of the [Project], TRI executed a Payment Instruction Letter on October 20, 2014 by which it irrevocably directed that all payments under the [MIPSA] be remitted to Punjab's Citibank account, which is defined as the 'TRI Account' in the sale agreements." (Washington Aff. at ¶ 2). Washington further stated that "TRI had no control, access to or ownership interest in the TRI Account" and that "TRI had no right to withdraw or otherwise exercise control over any money deposited in the TRI Account." (Washington Aff. at ¶ 3). Finally, Washington said that the bank codes "associated with the TRI Account," including the SWIFT code and the IBAN,[5] "are not registered to TRI." (Washington Aff. at ¶ 5).

---

[5] "SWIFT" stands for Society for Worldwide Interbank Financial Telecommunication. "IBAN" stands for International Bank Account Number.

{¶42} In his September 28, 2020 affidavit, Kumar, Punjab's Assistant General Manager, corroborated many of the details of Washington's affidavit. Kumar averred that "Punjab owns and controls the TRI Account" and that "[n]o other party herein, including TRI, has any ownership or other interest in the TRI Account." (Sept. 28, 2020 Kumar Aff. at ¶ 9). He further stated that "TRI may not withdraw money from the TRI Account," that "TRI has no control over any money inside the TRI Account," and that "TRI cannot direct what Punjab does with the money in the TRI Account." (Sept. 28, 2020 Kumar Aff. at ¶ 10-11). Finally, Kumar averred that the bank codes "associated with the TRI Account are all registered to Punjab." (Sept. 28, 2020 Kumar Aff. at ¶ 13). Indeed, documentation attached to the affidavit shows that the IBAN associated with the TRI Account is registered to Punjab's Southall branch in London, England. (Sept. 28, 2020 Kumar Aff., Ex. A). Thus, the Washington and Kumar affidavits confirm what is already clear from the PIL and Tri-Party Agreement: Purchase Price payments are to be paid to Punjab and deposited into a bank account controlled by Punjab to the exclusion of TRI.

{¶43} In summary, to support its motion for summary judgment, Punjab submitted copies of the MIPSA, PIL, and Tri-Party Agreement. Under the plain language of the MIPSA, payments of the Purchase Price are subject to the terms of the PIL. In the PIL (as clarified by the Tri-Party Agreement), TRI irrevocably

instructed NWO to make payments of the Purchase Price directly to Punjab by depositing Purchase Price payments into a bank account owned and controlled by Punjab. Furthermore, in the PIL, TRI relinquished its right to unilaterally channel Purchase Price payments into a different bank account.

{¶44} At the conclusion of these agreements in October 2014, TRI was effectively left with no rights to the Purchase Price payments. TRI could not control the direction of Purchase Price payments or their ultimate disposition. Instead, these agreements vested Punjab with these rights. Therefore, Punjab has demonstrated that there is no genuine issue of material fact that, under the agreements executed in October 2014, the parties intended for Punjab to own the right to receive Purchase Price payments. Furthermore, because the funds interpleaded by NWO are Purchase Price payments, Punjab has also demonstrated that there is no genuine issue of material fact that it has a right to the interpleaded funds.

**ii. As a matter of law, Hilliard has no right to the specific funds interpleaded with the trial court.**

{¶45} Although Punjab established it has a right to the interpleaded funds, Hilliard could, in theory, also demonstrate that it has a right to the interpleaded funds, in which case it would only be entitled to receive the funds if it demonstrated that its right to the funds is superior to Punjab's. However, Hilliard cannot demonstrate that it has a right to the interpleaded funds, let alone a superior right.

{¶46} Hilliard claims it has a right to the interpleaded funds as TRI's judgment creditor with a valid judgment lien on the funds. However, we have already determined that, under the agreements concluded in October 2014, TRI does not own the right to receive Purchase Price payments. Consequently, because the interpleaded funds constitute Purchase Price payments, TRI has no right to the interpleaded funds. And because TRI itself has no right to the interpleaded funds, Hilliard likewise can have no right to those funds. *See Toledo Trust Co. v. Niedzwiecki*, 89 Ohio App.3d 754, 757 (6th Dist.1993) ("[W]here the judgment debtor himself has no present right to obtain the money or property from the garnishee, then the judgment creditor likewise has no right to the property.").

{¶47} What is more, even if TRI had a right to the interpleaded funds as the possessor of the right to receive Purchase Price payments, Hilliard's judgment lien would not even be capable of attaching to that right. In Hilliard's view, TRI has "an equitable interest in the Purchase Price payments due under the MIPSA for lands and leases located in Paulding and Van Wert Counties." Hilliard maintains that "TRI retained an equitable interest in the proceeds from the sale [of] assets located in Paulding County" and that its "judgment attached to any property or interest TRI held in Paulding County, including its right to receive purchase price payments." However, where a judgment creditor files a certificate of judgment in accordance with R.C. 2329.02, as Hilliard did in this case, "said filing does not cause such

judgment to attach as a lien on the *equitable* interest of a judgment debtor." (Emphasis sic.) *Staskey v. Staskey*, 7th Dist. Jefferson No. 97-JE-69, 2000 WL 1902212, *4 (Dec. 29, 2000), citing *Bank of Ohio v. Lawrence*, 161 Ohio St. 543 (1954), paragraph one of the syllabus. Therefore, even if TRI had a right to receive Purchase Price payments and that right could be properly categorized as an equitable interest in real estate located in Paulding County, which we question, Hilliard's judgment lien would not attach.

{¶48} In sum, we conclude that there is no genuine issue of material fact that, under the agreements executed in October 2014, Punjab owns the right to receive Purchase Price payments. Moreover, because the interpleaded funds represent Purchase Price payments, we conclude that Punjab has a valid claim to the funds. In contrast, we conclude that Hilliard did not demonstrate that it has a valid claim to the interpleaded funds. Therefore, we conclude that, as a matter of law, Punjab is entitled to the interpleaded funds. Accordingly, the trial court did not err by granting Punjab's motion for summary judgment, denying Hilliard's motion for summary judgment, and awarding Punjab the interpleaded funds.

{¶49} Hilliard's assignments of error are overruled.

### IV. Conclusion

{¶50} For the foregoing reasons, Hilliard's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the

particulars assigned and argued, we affirm the judgment of the Paulding County Court of Common Pleas.

**_Judgment Affirmed_**

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/jlr**